IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-00275-01-CR-W-FJG |
| ) | |
| DERRICK E. ASHLEY ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Derrick Ashley's Motion to Suppress Evidence and Statements. For the reasons set forth below, it is recommended that this motion be granted.

I. INTRODUCTION

On August 16, 2005, the Grand Jury returned a three count indictment against defendants Derrick E. Ashley and Savaun L. Brown.[1] Count One of the indictment charges that from December 9, 2004, through May 3, 2005, defendants Ashley and Brown conspired with others to distribute fifty grams or more of a mixture or substance containing cocaine base. Count Two charges that on December 17, 2004, defendant Ashley possessed with intent to distribute five grams or more of a mixture or substance containing cocaine base. Count Three charges only defendant Brown.

On February 17, 2006, an evidentiary hearing was held on defendant's motion to suppress. Defendant Ashley was represented by Assistant Federal Public Defender Laine Cardarella. The Government was represented by Assistant United States Attorney Joseph Marquez. The Government called Investigator Chris Miller of the Buchanan County Drug Strike Force and Investigator Sean Collie of the Buchanan County Sheriff's Department as witnesses. The defense called Juanisha Ashley and defendant Derrick Ashley to testify.

II. FINDINGS OF FACT

---

[1]Defendant Brown entered a guilty plea on November 9, 2005.

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On December 17, 2004, Investigator Chris Miller, along with Investigator Tammy Parsons, Investigator Sean Collie and other investigators, went to a residence located at 729 South 17th Street in St. Joseph, Missouri. (Tr. at 3-4) On that day, officers were attempting to locate subjects with outstanding arrest warrants for distribution of illegal narcotics. (Tr. at 3) Officers went to the residence at 729 South 17th Street looking for a subject by the name of Joshua Hughes who had an outstanding warrant for drugs. (Tr. at 3, 33) Investigator Parsons had information from a confidential informant that Joshua Hughes was staying at the residence. (Tr. at 16) Joshua Hughes was one of Investigator Parsons' cases. (Tr. at 30) Investigator Miller did not know who lived at 729 South 17th Street at the time. (Tr. at 3)

2. Officers went to the front door of the residence and knocked. (Tr. at 4) Juanisha Ashley answered the knock at the door. (Tr. at 4) The officers asked for permission to search the residence for Joshua Hughes. (Tr. at 4) Mrs. Ashley gave the officers permission to come into the residence to look for Joshua Hughes. (Tr. at 4-5)

3. Upon entering the residence, Investigator Miller went towards a back bedroom. (Tr. at 5) The door to the bedroom was closed. (Tr. at 5) Investigator Miller opened the door, walked in and found a man (later identified as Derrick Ashley) sitting on the edge of a mattress in the room. (Tr. at 5) Investigator Miller asked the man who he was and requested information to confirm his identity. (Tr. at 6) Miller requested the man's information because he had never had prior contact with Joshua Hughes and he did not know who Derrick Ashley was. (Tr. at 6) Investigator Miller had not been given any information that Ashley was involved in criminal activity. (Tr. at 17) Miller took the information provided by Ashley and ran a computer check through the dispatch communications center for wants or warrants. (Tr. at 6) Investigator Miller testified that Ashley did not give him a photo I.D. or driver's license; rather, he gave his name, date of birth and Social Security number. (Tr. at 55) Ashley testified that he handed Miller his I.D. (Tr. at 72) Miller called dispatch to verify Ashley's identity and to verify that he was not somebody for whom the officers were looking. (Tr. at 55) A computer check was also run for Juanisha Ashley to check for wants or warrants and identification. (Tr. at 57)

4. While waiting for the computer check to come back, defendant Ashley asked Investigator Miller why the officers were at his residence. (Tr. at 6) Investigator Miller told Ashley that they were looking for a subject by the name of Joshua Hughes. (Tr. at 6) Mr. Ashley asked whether they could leave the bedroom and Investigator Miller replied that they needed to wait and check Ashley's information out to make sure that he had no wants or warrants. (Tr. at 6) Miller testified that he wanted to make sure the man claiming to be Derrick Ashley was not actually Joshua Hughes. (Tr. at 18-19)

5. The information did not come back right away. (Tr. at 6) Investigator Miller observed a little plastic twist on a dresser in the bedroom. (Tr. at 7) Miller described the plastic twist as a corner of a sandwich bag that has been twisted off. (Tr. at 19) Investigator Miller testified that the plastic twist was consistent with what he has seen used in previous investigations for packaging illegal narcotics. (Tr. at 7) Investigator Miller pointed to the twist and asked defendant Ashley what it was. (Tr.

2

at 7) Ashley appeared very nervous, walked over to the twist, picked up a cologne bottle, put the bottle on top of the twist and told Miller that it "wasn't anything." (Tr. at 7-8)

6. Investigator Miller then noticed a small safe on the floor. (Tr. at 7) Defendant Ashley bent down, turned a key in the lock on the safe and then took the key. (Tr. at 9) Miller testified that he did not know what Ashley's intent was in locking the safe. (Tr. at 20)

7. Investigator Miller asked defendant Ashley to sit down and advised him of his <u>Miranda</u> rights. (Tr. at 8-9) Investigator Miller then questioned Ashley about the safe. (Tr. at 8-9, 26) Miller asked Ashley if there was anything in the safe and Ashley replied that it was nothing for the officer to worry about. (Tr. at 9-10) Miller asked Ashley, "How much dope is in the safe?" and Ashley replied, "Why are you here? What's this got to do with me?" (Tr. at 27-28) Miller again asked, "How much is in the safe?" and Ashley did not reply. (Tr. at 28) Ashley did not offer to let Miller look inside the safe. (Tr. at 21) Miller testified that he did not ask for Ashley's permission to look in the safe. (Tr. at 21) Defendant Ashley testified that Investigator Miller asked if he could go in the safe and Ashley replied that he could not and that he should not worry about the safe because he said he was there looking for another person. (Tr. at 70-71) Ashley testified that Miller repeatedly asked him what was in the safe and could he open the safe and Ashley repeatedly told him no. (Tr. at 81-83) According to defendant Ashley, he had already told Investigator Miller that he could not look in the safe before Miller asked Juanisha Ashley and got a yes. (Tr. at 72)

8. While Investigator Miller was talking to defendant Ashley about the safe, Investigator Tammy Parsons came into the room. (Tr. at 10) Investigator Parsons asked Ashley about the whereabouts of Joshua Hughes. (Tr. at 10) Investigator Miller advised Investigator Parsons about what he had observed, that is Ashley's actions and the fact that he appeared nervous. (Tr. at 10) Miller further advised Parsons about the safe and the plastic twist and that he had advised Ashley of his <u>Miranda</u> rights. (Tr. at 10-11)

9. Investigator Miller then left defendant Ashley with Investigator Parsons while he went out to talk to Juanisha Ashley, defendant Ashley's wife. (Tr. at 11) As Investigator Miller was leaving the bedroom, Mr. Ashley reached up, grabbed Miller's coat and said "hold on." (Tr. at 11) Investigator Miller testified that Ashley did not want him to leave the room. (Tr. at 11) Miller went out to speak with Juanisha Ashley. (Tr. at 11-12) Investigator Miller asked Mrs. Ashley about the safe in the room. (Tr. at 12) Juanisha Ashley told Investigator Miller that the safe belonged to her and that she had purchased it for the purpose of keeping her handgun locked up and away from her kids. (Tr. at 12) Two young boys were present at the residence. (Tr. at 12) Investigator Miller asked Mrs. Ashley if the only thing that was in the safe was the gun and she said, "yes." (Tr. at 12) Investigator Miller asked Mrs. Ashley if the officers could search the safe to make sure that the only thing in the safe was the gun and Mrs. Ashley said that the officers could search the safe. (Tr. at 12) While Miller did not ask Mrs. Ashley if Mr. Ashley had permission to use the safe (Tr. at 22), Mrs. Ashley testified that her husband had access to the safe and was allowed to put things in and take things out of the safe. (Tr. at 59) Mrs. Ashley testified that she did not tell the officers that the safe was hers alone. (Tr. at 59)

3

10. Investigator Miller went back into the bedroom, approached defendant Ashley and asked him about the key that he had taken out of the safe. (Tr. at 12) Mr. Ashley told Miller that he did not have the key for the safe. (Tr. at 13) Investigator Miller told Ashley that he had seen him take the key out of the safe. (Tr. at 13) Ashley told Miller that did not know where it was. (Tr. at 13) Ashley then stretched out across the bed. (Tr. at 13) Ashley testified that he was, at this time, attempting to retrieve the key that he had tossed earlier. (Tr. at 80-81) Investigator Sean Collie had entered the bedroom while the discussion about the key was going on. (Tr. at 13) Investigator Miller asked Ashley to stand up. (Tr. at 37) Investigator Collie testified that he moved some blankets on the bed for officer safety reasons and found a key beneath a blanket where Ashley had been reaching. (Tr. at 13, 37-38) Investigator Miller testified that Investigator Collie then walked over to the safe and opened the safe with the key.[2] (Tr. at 13) Collie estimated that the officers were in the house twenty to thirty minutes before he opened the safe. (Tr. at 44)

11. Inside the safe was a clear plastic baggie containing several off-white rocks which the officers believed to be crack cocaine. (Tr. at 13-14) There was no gun in the safe. (Tr. at 14) Investigator Collie seized the baggie containing what the officers believed to be crack cocaine. (Tr. at 14) Collie then pulled the mattress back in the direction that defendant Ashley had reached and found a .9mm handgun. (Tr. at 14) Investigator Collie testified that he took the safe and the contents out to the kitchen area and showed these items to Mrs. Ashley. (Tr. at 39) Mrs. Ashley became hysterical, crying and screaming that it was not hers. (Tr. at 39)

12. After observing the clear plastic baggie and retrieving the handgun, the officers placed defendant Ashley in handcuffs and arrested him. (Tr. at 14) Investigator Miller asked Juanisha Ashley again about the safe. (Tr. at 15) Mrs. Ashley told Miller that she had purchased the safe to keep the gun locked up. (Tr. at 15) The officers left the safe with Mrs. Ashley so that she could safely store her gun in it. (Tr. at 41)

13. The officers field tested the substance in the plastic baggie and it tested positive for cocaine. (Tr. at 41)

14. Defendant Ashley was taken to police headquarters. (Tr. at 15) Investigator Miller again advised Ashley of his <u>Miranda</u> rights and obtained a rights waiver form. (Tr. at 15) Miller questioned Ashley about the package found in the safe and Ashley admitted that it belonged to him. (Tr. at 15)

15. Investigator Miller testified that during his contact with defendant Ashley, Ashley never told him not to look in the safe. (Tr. at 16) Miller further testified that he did not at any point in time ask defendant Ashley if he could look in the safe. (Tr. at 22)

---

[2]Investigator Collie testified that after he found the key under the blanket, Investigator Miller was talking to Mr. Ashley about the safe and Mr. Ashley referred to the safe as being his wife's safe. (Tr. at 38) According to Collie, he and Miller then left the bedroom to go to the kitchen area and talk to Mrs. Ashley. (Tr. at 38) Mrs. Ashley gave the officers permission to search the safe. (Tr. at 38) Collie testified that he and Miller then went back into the bedroom and Collie opened the safe. (Tr. at 38) As Collie remembers it, Miller's discussion with Mr. Ashley asking for the key to the safe happened before Miller asked Mrs. Ashley for permission to look in the safe. (Tr. at 47)

4

## III. DISCUSSION

Defendant seeks to suppress all evidence and statements obtained as a result of the search and seizure of his home, on the basis that such evidence and statements were obtained in violation of defendant's rights under the Fourth Amendment. (Motion to Suppress Evidence and Statements at 1) In support of the motion, defendant argues that the warrantless search of the safe within his bedroom was not justified by the consent of his wife. (Id. at 3) Defendant states:

> Mr. Ashley did not consent to a search of the safe in his bedroom. He manifested his lack of consent in both word and deed. The officers clearly understood that Mr. Ashley did not consent; there would be no other reason to seek out the consent of Mrs. Ashley. The search of the safe over Mr. Ashley's objection was in violation of his rights as guaranteed by the Fourth Amendment. Evidence that is seized as a direct result of a Fourth Amendment violation is inadmissible under the exclusionary rule.

(Id. at 4) Further, defendant argues that because the police violated his Fourth Amendment rights, the statements obtained from him following his arrest must be suppressed under the exclusionary rule. (Id. at 4-5)

The Fourth Amendment protects the home from warrantless searches and seizures. See United States v. Dunn, 480 U.S. 294, 300 (1987). An exception to this protection occurs where proper consent has been voluntarily given. See United States v. Matlock, 415 U.S. 164, 165-66 (1974). However, the Supreme Court has recently held that even when the police have obtained the permission of one occupant to search, "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." Georgia v. Randolph, 126 S.Ct. 1515, 1519 (2006). Later in the opinion, the Court reiterated the "rule" that "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." Id. at 1528.

In this case, the evidence is clear that defendant Ashley was in his bedroom when the police arrived. (See Fact No. 3, supra) Defendant Ashley exercised control over the safe located in his bedroom when he locked the safe and took the key. (See Fact No. 6, supra) No evidence was presented to justify the search other than Juanisha Ashley's consent, which consent, pursuant to

Randolph, is insufficient if defendant Ashley refused consent. While there is a factual dispute as to whether defendant Ashley told Investigator Miller that he could not look in the safe (defendant Ashley's testimony that he repeatedly told Investigator Miller that he could not open the safe after Miller repeatedly asked what was in the safe and could he open it (see Fact No. 7, supra) versus Investigator Miller's testimony that he did not ask defendant Ashley if he could look in the safe and Ashley never told him not to look in the safe (see Fact No. 15, supra)),[3] the Court finds that when defendant Ashley locked the safe and took the key (see Fact No. 6, supra), his intentions were clear, i.e. he did not want the officers to open the safe. At that point, it really does not matter whether Investigator Miller asked Mr. Ashley if he could look in the safe and Mr. Ashley refused thereby causing Miller to go to Mrs. Ashley to seek her consent or if Miller did not seek Mr. Ashley's consent and instead went directly to Mrs. Ashley because he knew it was futile to ask Mr. Ashley. Pursuant to the holding in Randolph, Mr. Ashley's refusal of consent is dispositive as to him, regardless of Mrs. Ashley's consent. The evidence recovered from the safe must be suppressed.

Given the Court's finding that the search of the safe was in violation of defendant Ashley's constitutional rights, defendant must also prevail on his argument that the statements obtained from him following his arrest must also be suppressed as fruits of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963). If the officers had not opened the safe and discovered the crack cocaine, they would not have arrested defendant Ashley and Ashley would not have made a statement at police headquarters.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting defendant Derrick Ashley's Motion to Suppress Evidence

---

[3] The Court finds the testimony of defendant Ashley to be more believable than that of Investigator Miller. It seems incredulous that Investigator Miller would not have asked defendant Ashley if he could look in the safe before asking Juanisha Ashley, given that defendant Ashley was in the room where the safe was located and had the key to the safe.

and Statements (doc #43).

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

          */s/ Sarah W. Hays*
          SARAH W. HAYS
          UNITED STATES MAGISTRATE JUDGE